IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 11-cv-02789-PAB-KMT

JUANETTA LAWRENCE,

      Plaintiff,

v.

SCHOOL DISTRICT NO. 1, IN THE CITY AND COUNTY OF DENVER, a/k/a Denver
Public Schools, and
BOARD OF EDUCATION OF SCHOOL DISTRICT NO. 1, IN THE CITY AND COUNTY
OF DENVER, a/k/a Denver Board of Education,

      Defendants.

---

## ORDER

---

      This matter is before the Court on the Motion for Summary Judgment [Docket
No. 71] filed by defendants School District No. 1 (the "School District") and the Board of
Education of School District No. 1 (the "Board").  The Court has jurisdiction over this
case pursuant to 28 U.S.C. § 1331.

## I.  BACKGROUND[1]

      Plaintiff Juanetta Lawrence is an African-American social worker licensed by the
State of Colorado.  Ms. Lawrence worked for defendants from November 1997 until her
termination on September 15, 2011.  Ms. Lawrence was employed by defendants
pursuant to a series of one-year contracts, which outlined her assignment for the
upcoming school year.  *See, e.g.,* Docket No. 72-15 at 2, ¶¶ 8-11.  At the beginning of

---

[1]The following facts, unless otherwise indicated, are not in dispute.

her employment, the School District assigned Ms. Lawrence as a social worker for

Montbello High School ("Montbello") during the 1998-1999 school year.  Beginning with

the 1999-2000 school year, Ms. Lawrence worked as a social worker at John Amesse

Elementary School ("John Amesse") where she remained through the 2003-2004

school year.  Docket No. 71-1 at 12 (Lawrence Dep. 26:11-18).

On April 1, 2004, Ms. Lawrence filed a complaint with the District Court for the

City and County of Denver, seeking a declaration regarding her employment status with

defendants.[2]  Docket No. 72-15; Docket No. 73-1 at 4, ¶ 27.  In her complaint, Ms.

Lawrence argued that she was a non-probationary (i.e. tenured) employee of the

School District pursuant to the Teacher Employment, Compensation, and Dismissal Act

of 1990 ("TECDA"), Colo. Rev. Stat. § 22-63-101 *et seq*.[3]  After an expedited one day

trial, the Denver District Court ruled in favor of Ms. Lawrence and found that she

qualified as a non-probationary employee based on the School District's practice of

granting non-probationary status to non-teacher employees once these employees

begin their fourth year of continuous employment with the School District.  Docket No.

72-15 at 7-8; Docket No. 73-1 at 1, ¶ 6.  The Denver District Court also ordered the

---

[2]Ms. Lawrence went by the name of Juanetta Gatewood after her second marriage.  Docket No. 73-1 at 1, ¶ 3; Docket No. 71-5 at 1, ¶ 2.

[3] Under TECDA, the School District has discretion to renew yearly contracts for probationary employees, whereas the School District can terminate non-probationary or tenured teachers only in accordance with TECDA procedures.  *See* Colo. Rev. Stat. §§ 22-63-203 and 22-63-301.  Ms. Lawrence argued that she was a non-probationary employee because the terms of her employment were governed by the collective bargaining agreement ("CBA") between the School District and the Denver Classroom Teachers Association ("DCTA").  Docket No. 71-1 at 39-129 (Exhibit A-17).

School District to assign Ms. Lawrence a position within the School District for the 2004-2005 school year.  Docket No. 72-15 at 8.

After the district court case, the School District assigned Ms. Lawrence as a rotating full-time substitute teacher for the 2004-2005 school year.  Docket No. 71-1 at 13 (Lawrence Dep. 27:7-8).  In 2005, Ms. Lawrence filed a petition for contempt with the Denver District Court.  Docket No. 72-15 at 9-10.  After a hearing, the court ordered the School District to assign Ms. Lawrence to a social worker position at Harrington Elementary School ("Harrington") and at Garden Place Elementary School ("Garden Place") for the 2005-2006 school year.  *Id*.; Docket No. 71-1 at 14 (Lawrence Dep. 29:11-21).  After the ruling on the petition for contempt, the School District assigned Ms. Lawrence to social worker positions only.

For the 2006-2007 school year, the School District assigned her to Sabin Elementary School ("Sabin") for three days a week, Stedman Elementary School ("Stedman") and Data Charter School ("Data") for one day a week, respectively.  *Id*. at 15 (Lawrence Dep. 30:13-21).  Ms. Lawrence worked at East High School five days a week for the 2007-2008 school year, *id*. at 16 (Lawrence Dep. 31:15-20), where she continued to work during the 2008-2009 school year.  For the 2008-2009 school year, however, East High School eliminated the five-day-a-week social worker position.  The School District reassigned Ms. Lawrence to East High School for three days a week, a position she shared with Heather Gardiner, another social worker.  *Id*. at 18 (Lawrence Dep. 37:5-9); *id*. at 19 (Lawrence Dep. 39:8-12).  Ms. Lawrence also worked at

Amandla Charter School ("Amandla") and the Denver City Department of Human

Services ("DHS") for one day a week, respectively.  *Id*. at 17 (Lawrence Dep. 32:22-25).

For the 2009-2010 school year, East High School consolidated its two three-day-

a-week social worker positions into a single five-day-a-week position requiring one

social worker.  *Id*. at 20 (Lawrence Dep. 40:13-21).  Ms. Lawrence applied for the new

five-day-a-week position at East High School, but was not selected.  *Id*. at 21

(Lawrence Dep. 41:1-7); *Id*. at 145 (Exhibit A-27).  Instead, the School District hired Ms.

Gardiner.  *Id*. at 38 (Lawrence Dep. 231:1-5); Docket No. 73-1 at 7, ¶ 48.  Ms.

Lawrence alleges that she should have received the assignment because Ms. Gardiner

is "a younger, less experienced, white female" social worker.  *Id*. at 6-7, ¶ 42.

On July 28, 2009, Dr. Eldridge Greer, the manager of Social Work and School

Psychologists for the School District, sent Ms. Lawrence an email with her assignment

for the 2009-2010 school year.  Docket No. 71-8 at 1, ¶ 3; *id*. at 4-5 (Exhibit H-1).  For

the 2009-2010 school year, Ms. Lawrence worked one day per week each at three

charter schools: North East Academy, KIPP Denver Collegiate High School ("KIPP"),

and Envision Leadership Preparatory Middle School ("Envision"), as well as two days a

week at DHS.  Docket No. 71-1 at 21 (Lawrence Dep. 41:8-12).

On August 28, 2009, Ms. Lawrence filed a charge of discrimination with the

Equal Employment Opportunity Commission ("EEOC").  Docket No. 58 at 4, ¶ 16;

Docket No. 73-1 at 7, ¶ 49.  In her charge of discrimination, Ms. Lawrence alleges that

she was subject to discrimination because of her race since her reassignment

constituted a significant change in her employment responsibilities.  Docket No. 58 at 4,

¶ 16.  Specifically, Ms. Lawrence states that her professional interactions with charter school and DHS personnel were of a different nature; she had fewer opportunities to develop cohesive working relationships with charter school and DHS personnel; and the constant travel increased the cost of her commute significantly.[4]  Docket No. 73-1 at 7-8, ¶¶ 50-51.

During the 2009-2010 school year, Dr. Greer received several complaints regarding Ms. Lawrence and her work performance.  On March 1, 2010, Dr. Barbara Downing, a school psychologist for the School District, advised Dr. Greer that Ms. Lawrence had not adequately completed a Threat Assessment for a North East Academy student.[5]  Docket No. 71-8 at 1, ¶ 4; id. at 6 (Exhibit H-2).  In addition, Envision requested that Ms. Lawrence not return for the 2010-2011 school year. Docket No. 71-8 at 2, ¶ 7.  According to an April 27, 2010 email from Gretchen Morgan, Envision's principal, Ms. Lawrence exhibited poor communication skills, insulted other staff members, and told an Envision parent that Envision did not care about her child. Id. at 7-8 (Exhibit H-3).  Kaye Taavialma, Kipp's principal, described Ms. Lawrence as underperforming, insubordinate, and unprofessional.  Id. at 9-10 (Exhibit H-4).

---

[4]The EEOC is currently investigating Ms. Lawrence's EEOC charge of discrimination.

[5]The Threat Assessment involved a North East Academy student, EW, who had threatened to bring a gun to school to shoot students and teachers.  Docket No. 71-8 at 6 (Exhibit H-2).  According to the Threat Assessment protocol, Ms. Lawrence was to assemble a Threat Assessment team consisting of an administrator from the school, a teacher, and possibly one of the student's parents to determine whether EW posed a credible threat.  Id.  Instead of convening such a team, Ms. Lawrence's Threat Assessment sought to ask questions of EW, contrary to protocol, and was otherwise largely incomplete.  Id.

In May 2010, Dr. Greer evaluated Ms. Lawrence's performance for the 2009-2010 school year and wrote a report which found that Ms. Lawrence was deficient in four of five required categories.[6]  *See* Docket No. 71-1 at 137-146.  Ms. Lawrence objected to Dr. Greer's evaluation, in part, because she believed Dr. Greer's evaluation was performed in violation of the CBA.  Docket No. 73-1 at 9, ¶¶ 56-58.  On May 27, 2010, Ms. Lawrence met with Dr. Greer and Debra Watson, manager of human resources ("HR"), to discuss Dr. Greer's evaluation.  Docket No. 71-8 at 2, ¶ 11.  On May 29, 2010, Ms. Lawrence filed a grievance through the CBA regarding Dr. Greer's evaluation.  Docket No. 73-1 at 9, ¶ 59; Docket No. 71-1 at 29 (Lawrence Dep. 163:16-20).  On June 10, 2010, a grievance meeting occurred between Dr. Greer, Ms. Watson, Rich Nass, a DCTA union representative, and Ms. Lawrence.  Docket No. 73-1 at 10, ¶ 61.  As a result of Ms. Lawrence's grievance, the School District agreed to expunge Dr. Greer's 2009-2010 evaluation from Ms. Lawrence's records and to reevaluate Ms. Lawrence in the fall of 2010.[7]  Docket No. 71-1 at 30 (Lawrence Dep. 167:20-168:3); Docket No. 73-1 at 10, ¶ 62.

In June 2010, Ms. Watson began an investigation into Ms. Lawrence's work performance because of the concerns and complaints raised by Ms. Lawrence's

---

[6]On January 25, 2010, Ms. Lawrence asked Dr. Greer whether she would receive an evaluation for the 2009-2010 school year.  Docket No. 73-1 at 8, ¶ 55; Docket No. 73-16 at 1.  Because of confusion between Dr. Greer and Human Resources, Dr. Greer could not advise Ms. Lawrence about whether she would be evaluated for the 2009-2010 school year.  Docket No. 73-16 at 2.

[7]The School District agreed to remove Dr. Greer's evaluation of Ms. Lawrence because, as of May 2010, Dr. Greer had not completed the requirements to obtain an administrative license.  Docket No. 73-11 at 3 (Greer Dep. 48:17-49:4).

6

supervisors.  Docket No. 73-12 at 3 (Watson Dep. 100:13-14).  In addition, Dr. Greer

contacted Wendy Pierce, Sabin's principal, because Principal Pierce had experience

supervising social workers at her school.  Docket No. 71-8 at 2, ¶¶ 12-13.  During this

conversation, Principal Pierce told Dr. Greer of Ms. Lawrence's performance problems

at Sabin during the 2006-2007 school year.  Specifically, Principal Pierce told Dr. Greer

that, in 2007, she issued a Letter of Warning to Ms. Lawrence for failing to complete a

student's Individualized Education Program ("IEP"), despite repeated requests that Ms.

Lawrence do so.  Docket No. 71-6 at 1, ¶ 6; *id.* at 3-4 (Exhibit F-1).  In addition, after the

Letter of Warning, Ms. Lawrence refused to perform her duties at Sabin, refused to

schedule an appropriate time for her supervisors to observe her work, and refused to

make changes to an IEP.[8]  Docket No. 71-7 at 1-2, ¶¶ 5-7.  Dr. Greer states that, after

his conversation with Principal Pierce, he decided to recommend that the School

District terminate Ms. Lawrence's employment.[9]  Docket No. 71-8 at 2, ¶ 14.

Nevertheless, on July 12, 2010, Dr. Greer emailed Ms. Lawrence that her assignment

for the 2010-2011 school year included four days per week at Stedman and one day a

week at North East Academy.  Docket No. 73-10; Docket No. 73-1 at 10, ¶ 63.

---

[8]Ms. Lawrence filed a grievance as a result of Principal Pierce's Letter of
Warning.  Docket No. 71-3 at 1, ¶ 5.  The School District denied Ms. Lawrence's
grievance after a Level II grievance hearing.  *Id.* at 3-4 (Exhibit C-1).  Following the
denial of the Level II grievance, an independent arbitrator also found that the School
District had just cause to issue the 2007 Letter of Warning.  *Id.* at 5-10 (Exhibit C-2).

[9]In his affidavit, Dr. Greer does not state with particularity when he spoke with
Principal Pierce.  It remains unclear whether Dr. Greer made the decision to terminate
Ms. Lawrence's employment before July 12, 2010, when he gave Ms. Lawrence her
school assignments for the 2010-2011 school year.

Once Dr. Greer made the recommendation of termination, he consulted with Ms. Watson and Walter J. Kramarz, the chief deputy general counsel for the School District. Docket No. 71-9 at 1, ¶ 2.  On August 13, 2010, Dr. Greer sent Ms. Lawrence an email requesting that she attend a meeting on Monday August 16, 2010.  Docket No. 73-1 at 10, ¶¶ 65-66; Docket No. 73-13 at 1.  On August 16, 2010, Dr. Greer and Ms. Watson told Ms. Lawrence that she would be placed on paid administrative leave.[10]  Docket No. 73-1 at 11, ¶ 67.  On August 19, 2010, Superintendent Tom Boasberg issued a recommendation that the Board terminate Ms. Lawrence's employment.  Docket No. 71-9 at 1, ¶ 2; *id*. at 3-8 (Exhibit I-1); Docket No. 73-1 at 11, ¶ 69.

Superintendent Boasberg's recommendation states that Ms. Lawrence's dismissal is appropriate due to her "engagement in unprofessional, inappropriate, insubordinate conduct, as well as her failure to exercise sound judgment throughout her history with the [School] District."  Docket No. 71-9 at 3 (Exhibit I-1).  Superintendent Boasberg's recommendation includes a detailed history of complaints raised about Ms. Lawrence's performance including, but not limited to, a 1999 memo written by Virginia Castro, former program manager for social work services, noting that Ms. Lawrence was insubordinate and failed to work collaboratively with co-workers, Docket No. 71-2 at 3 (Exhibit B-1), a February 2, 2004 letter from Angela Pegues Guillory, former assistant principal at John Amesse, noting concerns about Ms. Lawrence's lack of initiative and

_____

[10]Ms. Lawrence argues that this action was in violation of the CBA because she was not given a letter of warning, a letter of reprimand, or any other notice of an impending disciplinary action.  Docket No. 73-1 at 11, ¶ 68.  According to the CBA, Ms. Lawrence was entitled to notice of Dr. Greer's intent to consider corrective action. Docket No. 73-6 at 39 (Section 11-3 Corrective Action).

inability to work collaboratively with co-workers, Docket No. 71-5 at 3-4 (Exhibit E-1),[11] and the 2007 Letter of Warning written by Principal Pierce regarding Ms. Lawrence's failure to complete a student's IEP.  Docket 71-6 at 1, ¶¶ 5-6; *id*. at 3-4 (Exhibit F-1).

On December 31, 2010, the School District placed Ms. Lawrence on unpaid suspension from her position and terminated all of her benefits.[12]  Docket No. 73-1 at 11, ¶ 70.  As a result of these events, Ms. Lawrence filed a grievance with the union and, through her attorney, agreed to participate in a seven-day "just cause" arbitration before an impartial officer, Daniel C. Himelspach, Docket No. 71-9 at 1, ¶ 3; *id*. at 9-29 (Exhibit I-2); Docket No. 71-1 at 32 (Lawrence Dep. 180:17-22), who the parties jointly selected.  Docket No. 71-9 at 9 (Exhibit I-2).  The arbitration hearing was held on April 6, 7, 8, 13, 21, 22, and May 17, 2011.  *Id*.  The sole issue presented for arbitration was whether the School District had "just cause" to issue the August 19, 2010 recommendation to terminate Ms. Lawrence.  *Id*. at 11.  The School District had the burden of proof to show by a preponderance of the evidence that its recommendation to terminate Ms. Lawrence's employment was justified.  *Id*.  Ms. Lawrence had the opportunity to rebut all claims raised in Superintendent Boasberg's recommendation of dismissal.  *Id*. at 13.

---

[11]Although the recommendation of dismissal references the 1995-1996 school year, Docket No. 71-9 at 3 (Exhibit I-1), this reference appears to be an error since the information in the document actually refers to an evaluation of Ms. Lawrence's performance for the 1998-1999 school year for her work at Montbello.  Docket No. 71-9 at 14 (Exhibit I-2).

[12]A suspension without pay is considered corrective action under the terms of the CBA.  Docket No. 73-7 at 5, ¶ 3.

On August 16, 2011, Mr. Himelspach issued his findings of fact and conclusions of law.  *Id*.  In his findings of fact, Mr. Himelspach discussed each allegation raised in Superintendent Boasberg's recommendation for termination and determined whether the allegations supported a finding of insubordination, neglect of duty, or any other good cause for dismissal.  Mr. Himelspach concluded that a majority of the allegations raised in Superintendent Boasberg's recommendation were supported by the evidence presented at the arbitration hearing.  Mr. Himelspach found that Ms. Lawrence was either insubordinate or neglected her job duties in five of the twelve years she worked for the School District, including her time at Montbello during the 1998-1999 school year, at John Amesse during the 2003-2004 school year, at Sabin during the 2005-2006 and 2006-2007 school years, and at KIPP, North East Academy, and Envision during the 2009-2010 school year.  Mr. Himelspach's findings emphasized the 2007 Letter of Warning, Ms. Lawrence's failure to complete suicide risk assessments at KIPP and Envision during the 2009-2010 school year, as well as Ms. Lawrence's failure to complete a Threat Assessment for a student at North East Academy despite the fact that Dr. Downing "had given Ms. Lawrence multiple trainings" on Threat Assessments. *Id*. at 22-23.

In his conclusions of law, Mr. Himelspach determined that the allegations against Ms. Lawrence came from "many individuals, including some who were" not her direct supervisors.  *Id*. at 26.  Moreover, of the twelve schools for whom she had worked, "administrators from seven of those schools ha[d] issued some form of written and verbal dissatisfaction with her work."  *Id*.  Mr. Himelspach also determined that Ms. Lawrence's "insubordination was rampant with the administrators she decided not to

10

support," that her "neglect of duty" deprived her students of her services, and that her "approach to the administrators of a school environment constitutes 'other good and just causes' sufficient to justify termination." *Id*. at 27. Based on the evidence presented, Mr. Himelspach found that the School District's recommendation of termination was justified.

After receiving Mr. Himelspach's report, the Board dismissed Ms. Lawrence by vote on September 15, 2011.[13] Docket No. 58 at 6, ¶ 23; Docket No. 73-1 at 12, ¶ 72; Docket No. 73-14 at 6 (Board meeting minutes). Ms. Lawrence states that, on October 1, 2011, she received a letter from Kathleen Shiverdecker, executive director of HR, confirming the Board's vote to terminate her employment on September 15, 2011. Docket No. 73-1 at 12, ¶ 72.

As a result of her termination, Ms. Lawrence filed the present case. In her Second Amended Complaint [Docket No. 58], Ms. Lawrence asserts claims that defendants: (1) violated her equal protection rights under the Fourteenth Amendment; (2) retaliated against her in violation of 42 U.S.C. §§ 1981 and 1983; and (3) breached her employment contract. Docket No. 58 at 6-10. On July 9, 2012, defendants filed a motion to dismiss plaintiff's first claim for relief. Docket No. 63. On March 4, 2013, the Court dismissed that portion of plaintiff's first claim alleging violations of her equal protection rights as it related to her termination and defendants' retaliation. *See* Docket No. 98 at 7-9. Consequently, only that part of plaintiff's Fourteenth Amendment claim regarding her reassignment remains. *Id*. at 10. In the present motion, defendants

---

[13]The School District is a public school system and the Board is the final policy and decision maker for the School District. Docket No. 58 at 2, ¶¶ 5-6.

request that the Court enter summary judgment on all of plaintiff's remaining claims for relief.  Docket No. 71.

## II.  STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).  A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes over material facts can create a genuine issue for trial and preclude summary judgment.  *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

## III.  ANALYSIS

### A.   Motion to Strike Affidavit

Ms. Lawrence filed a Motion to Strike Dr. Eldridge Greer's Affidavit [Docket No. 81], claiming that the affidavit was not made in good faith and attempts to create a sham fact issue.  Docket No. 81 at 1.  Defendants oppose Ms. Lawrence's motion and argue that there are no inconsistencies between Dr. Greer's affidavit and his deposition testimony.  Docket No. 95 at 3-7.

Defendants correctly point out that cases disregarding affidavits that attempt to raise sham fact issues are ones where the party submitting the affidavit is opposing summary judgment, not, as here, moving for summary judgment.  Docket No. 95 at 2. In any event, the Court finds that Dr. Greer's affidavit is not contradicted by his earlier deposition testimony.  At best, any discrepancy between Dr. Greer's deposition and his affidavit can be attributed to the line of questioning at the deposition or to simple confusion of relevant dates.[14]  Because Dr. Greer's affidavit does not conflict with his deposition testimony, the Court will deny plaintiff's motion to strike Dr. Greer's affidavit.

### B.  Equal Protection Claim

Plaintiff asserts defendants discriminated against her because of her age and race in violation of the Fourteenth Amendment.  As noted above, Ms. Lawrence's only remaining Fourteenth Amendment claim relates to her reassignment from East High School to three charter schools and DHS.  Plaintiff argues that defendants reassigned her because of discriminatory animus and chose Ms. Gardiner who is a younger, less qualified white employee, for the five-day-a-week position at East High School.

_____

[14]For example, Ms. Lawrence alleges that paragraph twelve of Dr. Greer's affidavit presents a sham issue of fact.  Docket No. 81 at 5.  In paragraph twelve, Dr. Greer states that he contacted Principal Pierce in the summer of 2010 when he sought to find an assignment for Ms. Lawrence.  Docket No. 71-8 at 2, ¶ 12.  In his deposition, Dr. Greer testified that he did not talk to Principal Pierce in 2010 when he evaluated Ms. Lawrence.  Docket No. 81-1 at 8 (Greer Dep. 130:25-131:10).  It is undisputed that Dr. Greer evaluated Ms. Lawrence in May 2010 and sought to find her a placement after the resolution of Ms. Lawrence's grievance in June 2010.  Docket No. 73-1 at 10, ¶ 61.  Thus, there is no conflict between Dr. Greer's affidavit and his deposition as it is possible that Dr. Greer did not contact Principal Pierce in connection with Ms. Lawrence's evaluation in May 2010, but contacted her after June 2010 in connection with a possible placement.

To prevail on a § 1983 claim, a plaintiff must establish that defendants acted under color of state law and that the defendants' actions deprived plaintiff of some federal right. *Montgomery v. City of Ardmore*, 365 F.3d 926, 935 (10th Cir. 2004). Defendants do not dispute that they acted under color of state law; therefore, the Court will focus its analysis on whether plaintiff has established a violation of her Fourteenth Amendment rights.

The Equal Protection Clause of the Fourteenth Amendment mandates that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. The Equal Protection Clause protects against disparate treatment based on race or gender and is violated when the government treats someone differently than another who is similarly situated. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985); *Penrod v. Zavaras*, 94 F.3d 1399, 1406 (10th Cir. 1996). However, because § 1983 cannot be used to vindicate a violation of a constitutional right where Congress has otherwise created an incompatible and comprehensive enforcement scheme, courts perform a two-step inquiry to determine whether § 1983 is available to remedy a statutory or constitutional violation. *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 106 (1989). First, courts determine whether the plaintiff has asserted a federal right and, second, the courts determine whether Congress "specifically foreclosed a remedy under § 1983" by providing a "comprehensive enforcement mechanis[m] for protection of a federal right." *Id*. (internal citations omitted).

With regard to plaintiff's age discrimination claim, the Tenth Circuit has held that age discrimination claims brought under § 1983 are preempted by the Age

14

Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*.  *Migneault v. Peck*, 158 F.3d 1131, 1140 (10th Cir. 1998), *abrogated on other grounds by Kimel v. Fla. Bd. of Regents*, 528 U.S. 62 (2000); *see also Zombro v. Baltimore City Police Dep't*, 868 F.2d 1364 (4th Cir. 1989); *Ahlmeyer v. Nev. Sys. of Higher Educ.*, 555 F.3d 1051, 1057 (9th Cir. 2009).  The *Migneault* court adopted the reasoning of the Fifth Circuit's opinion in *Lafleur v. Texas Dep't of Health*, 126 F.3d 758, 760 (5th Cir. 1997), which found that "the ADEA is the sole remedy for persons who have been discriminated against based on their age."[15]  Accordingly, because the ADEA is the exclusive remedy for plaintiff's age discrimination claim, defendants are entitled to summary judgment on this claim.  *Migneault*, 158 F.3d at 1140.

With regard to plaintiff's race discrimination claim, to make out a prima facie case of discrimination, plaintiff must demonstrate "(1) membership in a protected class, (2) adverse employment action, and (3) disparate treatment among similarly situated employees."  *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008) (citation omitted).  Thus, to assert "a viable equal protection claim, plaintiff [ ] must first make a threshold showing that [she was] treated differently from others who were similarly situated to [her]."  *Brown v. Montoya*, 662 F.3d 1152, 1172-73 (10th Cir. 2011).

---

[15] In *Levin v. Madigan*, 692 F.3d 607, 616 (7th Cir. 2012), the Seventh Circuit rejected the reasoning of the other circuit courts and refused to find that the ADEA precluded a plaintiff's remedy under § 1983.  *Id*. at 616-17.  The Supreme Court granted *certiorari* to review the Seventh Circuit's decision.  *See Madigan v. Levin*, --- S.Ct. ----, 2013 WL 182748 (March 18, 2013).  Because this Court is bound to follow Tenth Circuit precedent, *see United States v. Spedalieri*, 910 F.2d 707, 709 n. 2 (10th Cir. 1990) ("A district court must follow the precedent of this circuit, regardless of its views concerning the advantages of the precedent of our sister circuits"); *Haynes v. Williams*, 88 F.3d 898, 900 n. 4 (10th Cir. 1996), the Court will follow the Tenth Circuit's decision in *Migneault.*

In this case, Ms. Lawrence satisfies the first prong of a prima facie case because, as an African-American, she is a member of a protected class.  However, Ms. Lawrence does not establish that her reassignment qualifies as an adverse employment action or that she was treated differently from similarly situated employees.

The Tenth Circuit has "liberally define[d] the phrase 'adverse employment action'" and takes "a case-by-case approach, examining the unique factors relevant to the situation at hand." *Hillig v. Rumsfeld*, 381 F.3d 1028, 1031 (10th Cir. 2004) (citations omitted).  However, the Supreme Court has held that "reassignment of job duties is not automatically" an adverse employment action.  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71 (2006).  The Court noted that, whether "a particular reassignment is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'"  *Id.* (internal quotation omitted).  To qualify as an adverse employment action, a reassignment must constitute a "significant change in employment status . . . with significantly different responsibilities, or a decision causing a significant change in benefits."  *Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007) (internal quotation omitted); *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 635 (10th Cir. 2012).  Although adverse employment actions are not confined to "monetary losses in the form of wages or benefits[,] . . . 'a mere inconvenience or an alteration of job responsibilities'" does not constitute an "adverse employment action."  *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998).  The question here is whether Ms. Lawrence's reassignment was a sufficiently

16

significant change to qualify as an adverse employment action.  *Hillig*, 381 F.3d at 1033.

Ms. Lawrence does not establish that her reassignment from East High School constituted a materially adverse employment action.  First, it is undisputed that the School District routinely assigned Ms. Lawrence to work at one or more schools before the 2009-2010 school year.  For example, for the 2005-2006 school year, the School District assigned her to Harrington and Garden Place.  Docket No. 71-1 at 14 (Lawrence Dep. 29:11-21).  For the 2006-2007 school year, she worked at Sabin for three days a week, Stedman for one day, and Data for one day.  *Id*. at 15 (Lawrence Dep. 30:13-21).  Moreover, for the 2008-2009 school year, Ms. Lawrence split her time between East High School, DHS, and Amandla.  *Id*. at 17 (Lawrence Dep. 32:22-25).  Based on these facts, it is evident that Ms. Lawrence had regular professional interactions with charter school employees prior to the 2009-2010 school year, and her ability to develop cohesive relationships was no more hampered during the 2009-2010 school year than in previous years.  *Daniels*, 701 F.3d at 636.  In addition, because Ms. Lawrence was required to travel to several assignments per week in the years preceding 2009, she cannot establish that her assignment to Kipp, Envision, North East Academy, and DHS for the 2009-2010 school year constitutes a *significant* change in her employment status or responsibilities.  *Hillig*, 381 F.3d at 1033 (noting that an adverse employment action needs more than "de minimis harm" or "de minimis impact"); *Sanchez*, 164 F.3d at 532 (finding that increasing a teacher's commute from five to forty-five minutes is not enough to establish adverse employment action).

Moreover, Ms. Lawrence does not argue that, because of her reassignment, she lost future job opportunities, her salary decreased, or that she lost employment benefits that she would have otherwise been entitled to. *See, e.g., McGowan v. City of Eufala*, 472 F.3d 736, 742-43 (10th Cir. 2006) (noting that the difference between the night and the day shift was not an adverse employment action because there were "no differences in pay and benefits, nor was the night shift more arduous"). From the record, it appears that Ms. Lawrence preferred working the five-day shift at East High School; however, a preference for working a particular schedule is "different from showing [that] her assignment was an objective demotion." *Daniels*, 701 F.3d at 636. Accordingly, Ms. Lawrence does not sufficiently establish that her assignment to Kipp, Envision, North East Academy, and DHS for the 2009-2010 school year constitutes an adverse employment action.

In addition, Ms. Lawrence does not sufficiently establish that she was treated differently from similarly situated employees. The evidence shows that she applied for the East High School social worker position along with Ms. Gardiner and the School District chose Ms. Gardiner. Docket No. 71-1 at 38 (Lawrence Dep. 231:1-5). Apart from conclusory allegations that the School District must have based the decision to hire Ms. Gardiner on Ms. Lawrence's race, Ms. Lawrence provides no other evidence in support of this claim. Ms. Lawrence has shown no irregularities in the decision to hire Ms. Gardiner. Docket No. 73-1 at 7, ¶¶ 45-49. In fact, John R. Youngquist, East High School's principal, sent Ms. Lawrence a letter indicating that they chose not to hire her for the social worker position. Docket No. 71-1 at 145. Ms. Lawrence does not claim,

nor has she presented evidence, that Principal Youngquist made this decision based on discriminatory animus.

Moreover, Ms. Lawrence has not established that she possessed significantly greater qualifications than Ms. Gardiner because she has presented no evidence of the criteria utilized by the School District to hire Ms. Gardiner and has not established why the School District's choice of Ms. Gardiner raises an inference of discrimination.[16] *See Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1309 (10th Cir. 2005) (noting that there was no showing of pretext where plaintiff conceded that employer could have a good-faith belief that successful candidate was at least as well qualified as plaintiff). Ms. Lawrence's argument is based purely on her subjective belief that she was a better qualified candidate than Ms. Gardiner. *See Simms v. Okla. ex rel. Dep't of Mental Health*, 165 F.3d 1321, 1329 (10th Cir. 1999) (noting that an employee's own opinions about his or her own qualifications does not create a material dispute of fact). Ms. Lawrence cannot establish an inference of preferential treatment based solely on the fact that Ms. Gardiner was outside of her protected class and the School District chose to hire Ms. Gardiner instead of plaintiff. *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005). Therefore, without more evidence, the Court finds that Ms. Lawrence has failed

---

[16]Although Ms. Lawrence claims that she completed more special education reports than Ms. Gardiner during the 2008-2009 school year, Docket No. 74-1, Ms. Gardiner does not establish that Principal Youngquist considered this criteria when making the hiring decision or that this criteria should have played a substantial role in Principal Youngquist's hiring decision. As noted above, because Ms. Lawrence does not show that Principal Youngquist had discriminatory animus, the simple fact that she might have outperformed Ms. Gardiner in one aspect of a social worker's job duties is insufficient to raise an inference of discriminatory animus. *See Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1309 (10th Cir. 2005).

to show that her reassignment constitutes disparate treatment in violation of the
Fourteenth Amendment.  Accordingly, defendants are entitled to summary judgment on
Ms. Lawrence's equal protection claim.[17]  *Daniels*, 701 F.3d at 636.

### C.  Retaliation

Ms. Lawrence claims that she was terminated for engaging in protected activity.
Docket No. 73 at 10.  Section 1981 of Title 42 forbids "all intentional racial
discrimination in the making and enforcement of private or public contracts."  *Exum v.
U.S. Olympic Comm.*, 389 F.3d 1130, 1134 (10th Cir. 2004); 42 U.S.C. § 1981(a).  The
Tenth Circuit has held that an employee who believes that she has been retaliated
against because of her efforts to vindicate her rights may bring an action against her
employer under 42 U.S.C. § 1981.  *See Twigg v. Hawker Beechcraft Corp.*, 659 F.3d
987, 997-98 (10th Cir. 2011).  The showing "required to establish retaliation is identical
under § 1981 and Title VII [of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-
17]."  *Id*. (citing *Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1110 (10th Cir.
1998)).  To establish a prima facie case of retaliation, Ms. Lawrence must demonstrate:
(1) that she engaged in protected opposition to discrimination; (2) that a reasonable

---

[17]Moreover, plaintiff's reassignment claim falls outside the statute of limitations
period.  *Hunt v. Bennett*, 17 F.3d 1263, 1265 (10th Cir. 1994) (noting that actions
asserted under 42 U.S.C. § 1983 are subject to the general personal injury limitation
period of the state in which the action arose).  Dr. Greer sent plaintiff an email regarding
her reassignment from East High School on July 28, 2009.  Docket No. 71-8 at 4-5
(Exhibit H-1).  Plaintiff did not initiate this case until October 26, 2011 [Docket No. 1].  In
Colorado, the appropriate statute of limitations for § 1983 actions is two years.  *Hunt*,
17 F.3d at 1266; Colo. Rev. Stat. § 13-80-102.  Defendants raised the statute of
limitations argument in their motion and plaintiff's response is devoid of any basis for
equitable tolling or application of Colorado's revival statute.  *See* Colo. Rev. Stat. §
13-80-111.  Thus, plaintiff's reassignment claim is time barred as it falls outside the
statute of limitations period for such a claim.  *Hunt*, 17 F.3d at 1265.

employee would have found the challenged action materially adverse; and (3) that a causal connection existed between the protected activity and the material adverse employment action. *Twigg*, 659 F.3d at 998.

An employee may proceed with a retaliation claim under a "mixed-motives" theory, whereby an employee must present evidence of conduct or statements by persons involved in the decision making process that may be viewed as directly reflecting the alleged retaliatory attitude. *Id*. at 1000. By contrast, when a plaintiff does not provide direct evidence of retaliation, she may instead rely on indirect evidence by using the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Twigg*, 659 F.3d at 998. Under this rubric, plaintiff must first establish a prima facie case of discrimination or retaliation. Then, the defendant may come forward with a legitimate, non-discriminatory or non-retaliatory reason for the adverse employment action. If the defendant has satisfied this burden of production, plaintiff must show that defendant's proffered rationale is pretextual. *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1212 (10th Cir. 2008). Ms. Lawrence does not clearly state under which theory she asserts her claim of retaliation; however, based on her arguments the Court will analyze her claim under the *McDonnell Douglas* framework.[18]

Ms. Lawrence alleges that Dr. Greer recommended termination in retaliation for the charge of discrimination she filed with the EEOC. Docket No. 73 at 10-11. Ms. Lawrence, however, does not assert a retaliation claim against Dr. Greer. Instead, she

---

[18]Plaintiff provides no direct evidence that Dr. Greer began the termination process because she filed her EEOC complaint. Rather, plaintiff relies on the circumstantial evidence of Dr. Greer's knowledge and motive.

seeks to hold defendants liable for Dr. Greer's alleged retaliatory animus.  *Id*. at 10-13.

In support of her claim that defendants are liable for Dr. Greer's actions, Ms. Lawrence

relies on two theories: (1) cat's paw liability[19] and (2) municipal liability under *Monell v.*

*Dep't of Social Servs. of N.Y.*, 436 U.S. 658, 691 (1978).  Docket No. 73 at 13-16.

### 1.  *Cat's Paw Liability*

Ms. Lawrence argues that defendants may be liable for Dr. Greer's retaliation

based on cat's paw liability, because the decisionmakers, Superintendent Boasberg

and School Board President Mary Seawell, did not conduct an independent

investigation into Ms. Lawrence's performance deficiencies, but instead relied on biased

information about plaintiff developed and espoused by Dr. Greer.  Docket No. 73 at 11.

In *Staub v. Proctor Hosp.*, --- U.S. ----, 131 S.Ct. 1186 (2011), the Supreme

Court considered the circumstances under which an employer may be held liable for

employment discrimination based on the discriminatory animus of an employee who

influenced, but did not make, the ultimate employment decision.  *Id*. at 1189.  The Court

held that an employer would be liable for an adverse employment decision if a

supervisor performs an act motivated by discriminatory animus that is intended by the

---

[19]The "cat's paw" theory derives its name from a fable in which a monkey
convinces a gullible cat to pull chestnuts out of a fire.  *See Cook v. IPC Int'l Corp.*, 673
F.3d 625, 628 (7th Cir. 2012).  "As the cat scoops the chestnuts from the fire one by
one, burning his paw in the process, the monkey eagerly gobbles them up, leaving
none left for the cat."  *EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d
476, 484 (10th Cir. 2006).  In employment discrimination law, the "cat's paw" theory can
apply when a biased subordinate who lacks decision-making authority uses the formal
decision maker "as a dupe in a deliberate scheme to trigger a discriminatory
employment action."  *Id*. (citation omitted).

supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action. *Id*. at 1194.

In *Equal Employment Opportunity Commission v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476 (2006), the Tenth Circuit first adopted cat's paw liability in a Title VII case. *BCI* held that a plaintiff can hold a defendant employer liable for the bias of a subordinate if the plaintiff can show that the "biased subordinate's discriminatory reports, recommendation, or other actions caused the adverse employment action." *Id*. at 487 (citing *Lust v. Sealy, Inc.*, 383 F.3d 580, 584 (7th Cir. 2004)). The Tenth Circuit noted that a plaintiff must establish more than mere "influence" or "input" in the decisionmaking process. *Id*. Additionally, the Tenth Circuit requires that the actions of the subordinate be the proximate cause of plaintiff's termination to hold a defendant liable. *See Crowe v. ADT Security Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011); *BCI*, 450 F.3d 486-88 ("[T]he issue is whether the biased subordinate's discriminatory reports, recommendation, or other actions caused the adverse employment action"); *Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1253 (10th Cir. 2006) ("a plaintiff must show that the allegedly biased [subordinate's] discriminatory reports, recommendation, or other actions were the proximate cause of the adverse employment action").

Defendants argue that cat's paw liability does not apply to §§ 1981 and 1983 claims because defendants cannot be subject to respondeat superior liability under these statutes. Docket No. 79 at 8. In support, defendants cite Seventh Circuit cases noting that cat's paw liability may not apply to claims against municipalities brought pursuant to §§ 1981 and 1983. *See Smith v. Bray*, 681 F.3d 888, 898-900 (7th Cir.

2012) (discussing cat's paw liability in connection with municipal liability under § 1981); *Waters v. City of Chicago*, 580 F.3d 575, 582 (7th Cir. 2009) (noting that cat's paw liability might not apply to a § 1983 municipal liability claim because respondeat superior liability does not apply to § 1983 claims); *Campion, Barrow & Assocs., Inc. v. City of Springfield Ill.*, 559 F.3d 765, 771 (7th Cir. 2009) (assuming cat's paw liability could apply to municipalities under § 1983 if, for example, a biased mayor and aldermen had influenced majority of city council to act); *but see Nagle v. Marron*, 663 F.3d 100, 117-118 (2d Cir. 2011) (finding that cat's paw liability could apply to school district if superintendent's conduct influenced the school board). The Tenth Circuit has yet to rule on this issue.

The Court assumes, without deciding, that cat's paw liability applies to Ms. Lawrence's § 1981 retaliation claim. To survive summary judgment on a cat's paw liability claim, a plaintiff must first establish a genuine issue of material fact concerning the bias of the subordinate. *BCI*, 450 F.3d at 488. If the plaintiff can establish subordinate bias, the plaintiff must next establish a causal relationship between the subordinate's actions and the employment decision. However, even if the Court assumes that Ms. Lawrence has established that Dr. Greer recommended her termination because of retaliatory animus, the Court finds that Ms. Lawrence fails to prove that Dr. Greer's retaliatory animus was the proximate cause of her termination.

It is undisputed that Ms. Lawrence had a fair opportunity to rebut all of the evidence contained in Superintendent Boasberg's recommendation during the arbitration hearing. Mr. Himelspach's report, Docket No. 71-9 at 9-29 (Exhibit I-2), which formed the basis for Mr. Lawrence's termination, details Ms. Lawrence's history

24

of insubordination.  This history began with her performance problems at Montbello during the 1998-1999 school year, includes the 2007 Letter of Warning, as well as Ms. Lawrence's failure to complete two suicide risk assessments and complete a Threat Assessment during the 2009-2010 school year. *Id*. at 22-23.  Mr. Himelspach's findings rely on evidence presented by Principal Pierce, Principal Morgan, and Dr. Downing, none of whom Ms. Lawrence alleges held discriminatory animus against her. Moreover, Mr. Himelspach's findings note that administrators in seven of the twelve schools for which Ms. Lawrence worked issued written or verbal complaints expressing dissatisfaction with her work performance.  *Id*. at 26.  Mr. Himelspach also found that Ms. Lawrence's insubordination deprived her students of necessary services, that her failure to work collaboratively with others was not acceptable in a school setting, and that her resistance to administrators caused her to fail to perform her duties effectively. *Id*. at 27.  Furthermore, it is undisputed that the Board relied on Mr. Himelspach's findings when it voted to terminate plaintiff's employment.  Docket No. 73-14 at 6 (Board meeting minutes).

Ms. Lawrence claims that the "investigation" conducted by defendants is "suspect."  Docket No. 73 at 14.  She says that Dr. Greer "actively participated in the arbitration hearing process to ensure she was fired," *id.* at 11, but provides no evidence to support the contention.  In fact, there is no evidence that Dr. Greer influenced Superintendent Boasberg, Mr. Himelspach, or any of the witnesses who testified at the arbitration hearing.  *Cf. Bray*, 681 F.3d at 900 (noting that plaintiff raised a triable issue of fact regarding subordinate bias because supervisor participated in termination decision and wrote a report to company headquarters, upon which the company

headquarters relied heavily).  It is undisputed that Dr. Greer drafted none of the reports of insubordination upon which Mr. Himelspach based his opinion.  *Cf. BCI*, 450 F.3d at 491 (noting that plaintiff raised a triable issue of fact regarding subordinate bias because supervisor "relied exclusively on [subordinate's] account").  Thus, although Dr. Greer's recommendation precipitated the events culminating in plaintiff's termination, Ms. Lawrence does not establish that Dr. Greer's discriminatory animus was the proximate cause of her termination.  Rather, the record reveals that defendants terminated Ms. Lawrence based on Mr. Himelspach's conclusion that she had a history of insubordination, that she neglected her duties, and that her insubordination was detrimental to the School District and its students.  *Crowe*, 649 F.3d at 1198.

Although *Staub* found that an independent investigation does not necessarily break the causal chain, here plaintiff has provided no basis on which a reasonable factfinder could conclude that Dr. Greer's allegedly retaliatory animus biased the arbitration or otherwise caused the Board to take an adverse employment action against Ms. Lawrence.  *Staub*, 131 S.Ct. at 1193-94; *see Jaramillo v. Adams Cnty. Sch. Dist. 14*, 680 F.3d 1267, 1271 (10th Cir. 2012) (finding that plaintiff could not establish cat's paw liability based on her supervisor's recommendation of termination because there was no proof of bias by the members of the intermediary review panel and the School Board, the final decisionmaker).

### 2.   *Municipal Liability*

Next, Ms. Lawrence claims that defendants are liable for Dr. Greer's retaliatory animus under a municipal liability theory.  Docket No. 73 at 16.  Ms. Lawrence argues

that defendants have an unofficial policy of ignoring complaints of discrimination raised by staff and students.  *Id*.

To establish municipal liability against defendants, Ms. Lawrence must prove the existence of an official policy or custom promulgated by defendants that was the "direct cause" or the "moving force" behind the alleged constitutional violations.  *See Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008) (noting that "in order for municipal liability to arise under section 1981, [plaintiff] must demonstrate that the [defendants'] officials acted pursuant to a 'custom or policy' of 'discriminatory employment practices'"); *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998). To show a policy or custom, Ms. Lawrence must establish the existence of (1) a formal regulation or policy statement, (2) an informal custom amounting to a widespread practice, (3) decisions of employees with final policymaking authority, (4) the ratification by a final decisionmaker of subordinates' actions, or (5) the failure to adequately train or supervise employees.  *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010).

Ms. Lawrence appears to base her policy or custom argument on the existence of an informal custom amounting to a widespread practice.  An informal "'custom' has come to mean an act that, although not formally approved by an appropriate decision maker, has such widespread practice as to have the force of law."  *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1177 (10th Cir. 2003).  In order to establish a custom, the actions of the municipal employees must be "continuing, persistent and widespread."  *Gates v. Unified Sch. Dist. No. 449*, 996 F.2d 1035, 1041 (10th Cir. 1993).  To prove the existence of such a "continuing, persistent and widespread"

27

custom, plaintiffs usually offer evidence suggesting that similarly situated individuals were mistreated by the municipality in a similar way.  A plaintiff's "failure to allege the existence of similar discrimination as to others seriously undermines her claim that the City maintained a custom of discriminatory personnel practices." *Carney*, 534 F.3d at 1274.

Ms. Lawrence argues that her state court case from 2004 and several news articles establish that defendants have an informal policy of ignoring complaints of discrimination raised by staff or students.  Docket No. 73 at 16; Docket No. 73-15; Docket No. 73-24.  The Court does not find this argument persuasive.  First, plaintiff's state court case from 2004 does not involve a complaint about racial discrimination, but rather pertains to an employment dispute and therefore is not relevant to the issues presented here.  Second, plaintiff's news articles are wholly conclusory as they do not identify who ignored the complaints, when the complaints were ignored, or any instances where complaints lodged by minority teachers or staff were ignored.  *Bryson*, 627 F.3d at 788.  Thus, even viewing this evidence in the light most favorable to plaintiff, it is insufficient to give rise to an inference of a widespread School District practice of ignoring complaints by minorities "so permanent and well settled as to constitute a custom or usage with the force of law."  *Id*. at 791 (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)).  Accordingly, because Ms. Lawrence does not raise a triable issue fact with regard to the existence of defendants' informal custom of ignoring complaints by minorities, the Court finds that defendants are entitled to summary judgment on Ms. Lawrence's claim of retaliation.

28

### D.  Breach of Contract

Ms. Lawrence asserts a state law breach of contract claim against defendants. Docket No. 58 at 10-11.  Having determined that defendants are entitled to summary judgment on Ms. Lawrence's federal claims, the Court declines to exercise supplemental jurisdiction over her state law claim.  *See* 28 U.S.C. § 1367(c)(3); *Brooks v. Gaenzle*, 614 F.3d 1213, 1229 (10th Cir. 2010) ("pendent jurisdiction over state claims is exercised on a discretionary basis and . . . if federal claims are dismissed before trial, leaving only issues of state law, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.") (internal citations and alterations omitted).

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Plaintiff's Motion for Leave to File Attached Sur-Reply to Defendants' Reply Filed at ECF #79 on November 23, 2012 and Certification of Compliance with D.C.Colo.LCivR 7.1(a) [Docket No. 86] is **GRANTED**.  It is further

**ORDERED** that Plaintiff's Motion to Strike Dr. Eldridge Greer's Affidavit Filed at ECF #71-8 and Certificate of Compliance with D.C.Colo.LCivR 7.1(a) [Docket No. 81] is **DENIED**.  It is further

**ORDERED** that Defendants' Motion for Summary Judgment [Docket No. 71] is **GRANTED**.  It is further

**ORDERED** that Plaintiff's Motion in Limine and Certification of Compliance with D.C.COLO.LCivR 7.1(A) [Docket No. 102] is **DENIED** as moot.  It is further

**ORDERED** that Plaintiff's Motion re Presentation of Witnesses and Evidence and Other Issues Affecting the Duration and Course of the Trial and Certification of Compliance with D.C.COLO.LCivR. 7.1(A) [Docket No. 110] is **DENIED** as moot.  It is further

**ORDERED** that the trial set for May 7, 2013 is **VACATED**.  It is further

**ORDERED** that, within 14 days of the entry of judgment, defendants may have their costs by filing a bill of costs with the Clerk of the Court.  It is further

**ORDERED** that this case is closed in its entirety.

DATED April 18, 2013.

BY THE COURT:

 s/Philip A. Brimmer                                    
PHILIP A. BRIMMER
United States District Judge